**Sara Lee BRAUN, individually and as executor of the estate of Norman Braun, deceased, Plaintiff–Appellant,**

v.

**LORILLARD INCORPORATED and Hollingsworth & Vose Company, Defendants–Appellees.**

No. 95–4094.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1996.

Decided May 17, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied June 14, 1996.

Rick M. Schoenfield (argued), Daniel Swartzman, Kimberlee Massin, Schoenfield & Swartzman, Chicago, IL, Daniel G. Childs, Thomas Johnson, Johnson & Childs, Philadelphia, PA, for Sara L. Braun.

Mark J. Evans, David K. Hardy, William S. Ohlemeyer, Roger Geary (argued), Shook, Hardy & Bacon, Kansas City, MO, Gary M. Elden, George R. Dougherty, Grippo & Elden, Chicago, IL, for Lorillard Inc.

Stanley V. Boychuck, David E. Kawala, Swanson, Martin & Bell, Chicago, IL, Lori J. Polacheck, Stephen J. Brake, Andrew J. McFlaney (argued), Daniel R. Harris, Nutter, McClennen & Fish, Boston, MA, for Hollingsworth & Vose Co.

Before POSNER, Chief Judge, and ROVNER and EVANS, Circuit Judges.

POSNER, Chief Judge.

Concerns with the abuse of the litigation process are being voiced ever more loudly. There are grounds for these concerns, but at least with respect to the federal courts of this circuit the concerns are exaggerated. Most of the district judges and other front-line federal judicial officers in this circuit exercise firm control over the conduct of litigation in a generally successful effort to prevent litigation from getting out of hand in point of delay or expense, or from being degraded by "junk science," appeals to prejudice, runaway jury verdicts, and other justly reprobated abuses of the legal process. In this case a disappointed personal-injury plaintiff argues that the district judge exercised *too* firm a control over the proceedings. Let us see.

In the 1950s the Lorillard tobacco company sold Kent cigarettes with a filter that contained crocidolite asbestos, the most toxic form of asbestos. (Chrysotile asbestos, the most common form of asbestos, is much less toxic.) This was the famous "micronite" filter, one of those forgotten 1950s icons like 3–D movie glasses and chicken à la king. The filter had been manufactured by Hollingsworth & Vose. Norman Braun smoked these cigarettes and many years later developed mesothelioma, a form of cancer that is most commonly caused by exposure to crocidolite asbestos. He died of the disease at the age of 63 during the course of this suit, a diversity suit that seeks to affix tort liability on Lorillard and Hollingsworth & Vose by means of the common law doctrines of strict products liability, negligence, and recklessness. The applicable substantive law is that of Pennsylvania but nothing turns on this; the only issues raised by the appeal are procedural.

The case went to trial. The main defense was that the asbestos fibers in the micronite filter would not have been released from the filter in the course of smoking and therefore could not have caused Mr. Braun's mesothelioma. Not all cases of mesothelioma are due to exposure to crocidolite asbestos, though most are. And even if Braun's case was due to such exposure, he may have been exposed to crocidolite asbestos from sources other than the Kent micronite filter.

The trial lasted three weeks and featured an impressive parade of expert witnesses. The jury deliberated, and returned a verdict for the defendants. The plaintiff's appeal does not question the sufficiency of the evidence to support the verdict but does challenge a number of the district judge's evidentiary rulings. It should be unnecessary to point out that the verdict was not a determination that cigarettes are harmless to human health or even that Kent's micronite filter was incapable of causing mesothelioma. It was merely a determination that the plaintiff had failed to prove that the filter had caused her decedent's mesothelioma.

The most consequential of the evidentiary rulings challenged by the plaintiff's appeal is the exclusion of testimony by David Schwartz, an expert witness called by the plaintiff, that lung tissue obtained in the autopsy of Mr. Braun contained crocidolite asbestos fibers. Dr. Schwartz is a professor of biochemistry and the president of a consulting firm that does environmental testing with particular emphasis on testing for the presence of asbestos, including crocidolite asbestos. He directed his lab assistant to subject a section of Braun's lung tissue to "high temperature ashing," in which the substance being tested for the presence of asbestos fibers is, in effect, boiled away by the application of heat, leaving the asbestos (if any), since asbestos is highly heat resistant. The assistant did a spectrographic analysis of the residue. According to his oral report to Schwartz, the analysis revealed the presence of crocidolite asbestos fibers.

This was the only evidence that such fibers were present in Braun's lungs, although there was expert testimony that the absence of such fibers when he died was not inconsistent with their having been there earlier and caused Braun's mesothelioma. The judge would not let Schwartz's testimony concerning the presence of the fibers go to the jury. Although Schwartz is an acknowledged expert on the testing of building materials for asbestos, he had never before conducted a test on human or animal tissue. Nor, so far as appears, has high temperature ashing ever been used by anyone else to test for the presence of asbestos fibers in tissue. The

standard methods of testing for such presence go by the names of "bleach digestion" and "low temperature plasma ashing." The plaintiff's lawyers had hired recognized experts in the detection of asbestos in tissue, and those experts had conducted tests of tissue from Braun's lungs using the standard methods, and had found nothing. The lawyers then turned to Dr. Schwartz and asked him to do something different, and he obliged. At his deposition, and later at the voir dire to determine whether he should be allowed to give opinion evidence, he testified that high temperature ashing is as usable on tissue as on bricks. He acknowledged the possibility that the method might "break fibers and hence spuriously increase their number," and, more serious still, might alter the chemistry of the sample. The altered chemistry might affect the spectrographic profile of any fibers found in the residue— might alter the "appearance" of the fibers so that it was impossible to tell whether they were crocidolite fibers or some other type of asbestos fiber. But he testified that his method was far more likely to produce a false negative than a false positive, though in fact it was the only method used on Mr. Braun's lung tissues that produced a positive test result.

■ The plaintiff complains that the district judge excluded Dr. Schwartz's evidence merely because he did not use one of the generally accepted methods of testing for the presence of crocidolite asbestos in human tissues. The Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that the opinion evidence of reputable scientists is admissible in evidence in a federal trial even if the particular methods they used in arriving at their opinion are not yet accepted as canonical in their branch of the scientific community. But that is only part of the holding of *Daubert*. The other part is that the district court is responsible for making sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work. *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996); *Bammerlin v. Navistar Int'l Transportation Corp.*, 30 F.3d 898, 901 (7th Cir.1994). The scientific

witness who decides to depart from the canonical methods must have grounds for doing so that are consistent with the methods and usages of his scientific community.

■ The district judge did remark at one point that *Daubert* requires that the expert's method be one "customarily relied upon by the relevant scientific community," which is incorrect. But she did not rest her decision to exclude his testimony on that ground. Her ground was that Schwartz had testified "that he really didn't have any knowledge of the methodology that should be employed, and he still doesn't have any information regarding the methodology that should be employed with respect to lung tissue. It seems to me that this witness knows absolutely nothing about analyzing lung tissue and [for?] asbestos fibers." The plaintiffs' lawyers committed a serious violation of 7th Cir.R. 30(c) by falsely certifying that all materials required by Rule 30 to be included in the appellant's appendix had been included, while leaving out the part of the trial transcript that contains the principal ground for Judge Manning's ruling that Dr. Schwartz could not give an opinion on the presence of asbestos fibers in Braun's lung tissues. By including in their appendix only the passage in which the judge misdescribed the holding of *Daubert*, the lawyers gave the impression that this misdescription was the entire basis for the judge's ruling. A false Rule 30(c) certification is grounds for dismissing an appeal, *Mortell v. Mortell Co.*, 887 F.2d 1322, 1327 (7th Cir.1989); *Urso v. United States*, 72 F.3d 59, 61–62 (7th Cir.1995), though it will not be necessary for us to decide whether it would be an appropriate sanction in this case.

Dr. Schwartz had never tested human or animal tissues for the presence of asbestos fibers (or, so far as appears, for anything else) before being hired by the plaintiff's lawyer. And he did not bother to familiarize himself with the standard methods for conducting such tests or to consult with scientists who are the experts in analyzing tissue. It was after he acknowledged this surprising lack of preparation, and the fact that the suggestion for using his method on human

tissues had come from lawyers rather than anyone (himself included) in the scientific community, and that he spends 99.9 percent of his time engaged in administrative and marketing activities for his consulting firm (we suppose he meant of his consulting time, since he is also a professor), and that he could not name anyone who has done work analyzing tissues for the presence of asbestos fibers, that Judge Manning, reversing her earlier ruling, decided to exclude his testimony concerning the presence of crocidolite asbestos fibers in Braun's lungs. Suppose that a scientist engaged in a research project rather than in a lawsuit had come to Schwartz with a section of lung tissue that he wanted tested for asbestos fibers. Would Schwartz, having no previous experience with the testing of tissue, have offered to use the method that he uses for testing ceiling tiles, without first acquainting himself with the accepted methods for testing human tissues and consulting with the users of those methods for advice on whether his method was as good (or better), or, contrariwise, might produce misleading spectrographic images?

■ Nowhere in *Daubert* did the Court suggest that failure to adhere to the customary methods for conducting a particular kind of scientific inquiry is *irrelevant* to the admissibility of a scientist's testimony. On the contrary, the Court made clear that it is relevant. 509 U.S. at 591–95, 113 S.Ct. at 2796–97. A judge or jury is not equipped to evaluate scientific innovations. If, therefore, an expert proposes to depart from the generally accepted methodology of his field and embark upon a sea of scientific uncertainty, the court may appropriately insist that he ground his departure in demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry. To forsake the accepted methods without even inquiring *why* they are the accepted methods— in this case, why specialists in testing human tissues for asbestos fibers have never used the familiar high temperature ashing method—and without even knowing *what* the accepted methods are, strikes us, as it struck Judge Manning, as irresponsible.

Consider: A litigant's lawyers approach a scientist and tell him that the accepted methods of testing for asbestos fibers in human tissues have come up negative. They ask him to use a different method and he without pause offers to use one that is designed for use on building materials and has never been used on human or animal tissues. Not even knowing what the accepted methods of testing for the presence of asbestos in tissue are, let alone ever having conducted such a test, the scientist agrees to perform the test by his method, using a lab assistant (which is fine) but relying on the lab assistant's purely oral report, which is not fine given the novelty of the procedure. He speculates that his method is perfectly transferable from building materials to human tissues. Since he has never done any testing of those tissues, his speculations lack the authority of science. These are the symptoms of forensic science, an oxymoron. The plaintiffs' lawyers could have called one of the recognized experts in the testing of human tissues to validate Dr. Schwartz's novel methodology—the ones they had hired, for example—but they did not.

■ Modern science is highly specialized. An expert in the detection of asbestos in building materials cannot be assumed to be an expert in the detection of asbestos in human tissues even though, as the plaintiff reminds us, many building materials, most obviously wood, are, like human and animal tissues, organic rather than inorganic substances. The fact that the plaintiffs' lawyer turned to this nonexpert, having already consulted experts without obtaining any useful evidence, is suggestive of the abuse, or one of the abuses, at which *Daubert* and its sequelae are aimed. That abuse is the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side in a lawsuit.

■ So we think the district judge was entitled to screen out Dr. Schwartz's testimony concerning the presence of crocidolite asbestos in Braun's lungs, and we move on to the next question, which concerns the defen-

dants' request, granted by the judge, for the negative test results of the plaintiff's nontestifying experts. Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure forbids the judge to order disclosure in pretrial discovery of the facts found or opinions formulated by an opponent's nontestifying experts except (so far as relevant to this case) "upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." The underlying rule, that of nondisclosure, invites shopping for favorable expert witnesses and facilitates the concealment of negative test results. That is neither here nor there; the exception is a narrow one. But Judge Manning thought it applicable here.

When the defendants learned that the plaintiff's experts were going to test Braun's lung tissues for the presence of crocidolite asbestos, they were concerned because the tests would destroy the tissues tested and they wanted to conduct their own tests. The plaintiff's lawyers assured them that the destruction of the tissues would not hurt the defense. Any asbestos fibers would be uniformly distributed throughout the lung tissues, so that tests conducted by the defendants' experts on the sections of tissues that they had received from the autopsy would be tests of a reliable sample of the tissues as a whole. Later the plaintiffs' lawyers changed their tune. No longer did they suggest that crocidolite fibers if present would be uniformly distributed, for they wanted to protect themselves from an inference that negative test results on the tissue samples tested by the defendant's experts (who found no crocidolite fibers) would imply the absence of fibers throughout Braun's lungs. The change of position hampered the defense, which could not conduct its own tests on tissues that had been destroyed in the course of the plaintiff's tests. The only way the defense could find out whether there were crocidolite asbestos fibers in the tissues that the plaintiff's experts had tested was to get the test results. The condition for the exception in Rule 26(b)(4)(B) thus was satisfied, and we move to the next issue.

The plaintiff wanted to call as a witness a Richard McHenry, who had worked many years earlier for a company that manufactured cigarette filters. The plaintiff expected McHenry to testify that Lorillard had approached his company because of concerns about the danger from the asbestos in the Kent filters manufactured by Hollingsworth & Vose. McHenry was not, however, disclosed in the final pretrial order; and therefore under a standing order of the district judge he could not be called as a witness "absent good cause shown" for the omission of his name from the pretrial order. Cf. Fed.R.Civ.P. 26(a)(3), 37(c). The plaintiff's lawyers knew about McHenry—knew that he had been associated with a company approached by Lorillard regarding the possibility of replacing the asbestos filter. His name and a brief sketch of his relation to the filter issue appeared in several documents that the lawyers had had for more than a year. They just failed to look for him until nearly the eve of trial. There is no indication that he would have been tough to find any earlier, like the witness in *Griman v. Makousky*, 76 F.3d 151 (7th Cir.1996), where, nevertheless, we upheld the district judge's order excluding the witness's deposition because the plaintiff had failed to make a diligent effort to produce him for the trial. Braun's lawyers had a business address for McHenry, albeit an old one, in Philadelphia. They could have called directory assistance for Philadelphia to get his current phone number. They did not, but eventually someone gave them his number and they interviewed him.

The trial had already begun in *Griman* when the plaintiff sought to introduce the deposition of the missing witness; but, given the deposition, at least there was no surprise to the defendants. In the present case the plaintiffs' lawyers announced their intention to call the witness ten days before the trial. This limited the surprise, but it still would have complicated the defendants' preparations for trial, maybe seriously, to have to depose him and perhaps look around for a witness to counter his testimony. The judge did not abuse her discretion in deciding that because of the lack of diligence in locating McHenry in time to list him in the pretrial order, the plaintiff could not add him later.

Braun's lawyers, being specialists in litigation against cigarette companies, had no compelling excuse for failing to locate so promising a potential witness for their side as they now consider McHenry to be.

Having failed to get him approved as a witness in the plaintiff's case in chief, the lawyers tried to call him as a rebuttal witness, and were again rebuffed. The standing order's requirement of good cause, as they point out, does not apply to rebuttal witnesses—unless they are "presently identifiable." McHenry was. What is more, McHenry was not a proper rebuttal witness. The plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief. *Bronk v. Ineichen*, 54 F.3d 425, 432 (7th Cir.1995); *Gossett v. Weyerhaeuser Co.*, 856 F.2d 1154, 1156–57 (8th Cir.1988). Otherwise the plaintiff could reverse the order of proof, in effect requiring the defendants to put in their evidence before the plaintiff put in his.

The next issue concerns hearsay. In 1954 Lorillard had hired Althea Revere, who died in 1987, to examine Kents under an electron microscope. There is no documentary record of the results of her study. The plaintiff sought to call as witnesses Revere's son, and a journalist who had interviewed her in 1980, to testify that she had told them that she had reported to Lorillard that the Kent filters leaked asbestos into the cigarette smoke and that this made the smoke more dangerous than it would have been without a filter. (If the added protection from the filter offset the added danger from the asbestos in the filter, and a filter not containing asbestos would not have been as effective, the plaintiff might not have a claim. But we needn't get into that.) This testimony would have been hearsay, and would not have fallen within any of the specific exceptions to the hearsay rule. It would have been admissible if at all only under the catch-all exception, which requires that the judge be satisfied that the hearsay is as reliable as hearsay falling within the specific exceptions. Fed.R.Evid. 804(b)(5); see also Rule 803(24).

The district judge did not abuse her discretion in excluding these witnesses as purveyors of unreliable hearsay. The conversations with Althea Revere had occurred many years after she had done the work for Lorillard on the Kent filters. Her son had been only 14 in 1954, and he based his testimony about what his mother had told him on conversations that he had with her primarily in the 1960s and 1970s. The journalist interviewed her in 1980. These witnesses were not vague, but neither were they sufficiently precise and knowledgeable to enable a proper evaluation of the significance of the mother's out-of-court statements (or so at least the district judge could find). Whom had she spoken to at Lorillard? How definite had she been? What kind of supporting evidence had she provided? What had been the response to her report? There is no indication that the witnesses knew the answers to these questions.

The dangers of this sort of hearsay are obvious. A witness testifies to what he or she was told many years ago about events that had taken place many years before that by someone who is now deceased and left no documentary record. There is no way, given the remoteness of the events testified to, for the opposing party to verify the accuracy of the testimony or of the out-of-court statement that the testimony reports. Yet because memories fade and play tricks, see, e.g., *Krist v. Eli Lilly & Co.*, 897 F.2d 293 (7th Cir.1990), the reliability of the statement cannot be taken for granted. Maybe Carl Sandburg went too far when he called the past "a bucket of ashes" (a metaphor appropriate, however, to a case about cigarettes), but we must not ascribe to courts a superhuman capacity to reconstruct the past.

Another unexceptionable ruling was to allow the chief executive officer of Lorillard to testify as an expert witness on the question whether it was likely that the micronite filter actually released asbestos fibers into the smoker's mouth and lungs, either directly or in the smoke. A litigant, or a litigant's CEO, or sole stockholder, or mother, or daughter is not, by reason of his or her or its relation to the litigant, disquali-

fied as an expert witness. We have had a case in which the plaintiff was his own expert witness. We pointed out that there was no impropriety in this; he was qualified to give an expert opinion on the matters in suit. *Tagatz v. Marquette University*, 861 F.2d 1040, 1042 (7th Cir.1988).

Alexander Spears III, the chief executive officer of Lorillard, has a Ph.D. in organic chemistry, has published a number of scientific articles, and was for many years Lorillard's director of research. In that capacity he studied the design and construction of cigarette filters and participated in the development of such filters. He has also been involved in the development of smoking inhalation machines and in animal studies of smoke inhalation. In preparation for testifying at the Braun trial he studied the literature concerning the micronite filter and the experiments conducted by the plaintiff's experts. This study and his scientific background qualified him to offer an opinion on whether the micronite filter was likely to have released asbestos fibers in the course of smoking.

■ Of course Dr. Spears could hardly be thought a disinterested expert witness. No more could Dr. Tagatz. No more, for that matter, can an expert witness who, though unrelated to any of the litigants, is testifying in exchange for a handsome fee. *Id.* at 1042. The jury was not kept in the dark concerning Dr. Spears' relation to Lorillard. He admitted under cross-examination that part of his job as the chief executive officer of Lorillard was to represent the company as a witness in lawsuits. In light of this admission, and of his relation to the defendant with or without the admission, the jury is likely to have discounted his testimony heavily, making the judge's ruling harmless error if it was error at all; we do not think it was error.

The last evidentiary ruling that is challenged, and the only one that we think *can* plausibly be described as an abuse of discretion, concerns testimony by one of the plaintiff's experts, Dr. David Cugell. Dr. Cugell testified that because asbestos fibers disappear from living tissue at a rate of 15 percent a year, the absence of fibers in the lung tissues obtained at Mr. Braun's autopsy did not prove that his mesothelioma was not due to asbestos. On cross-examination Cugell was asked whether another acknowledged expert on asbestos diseases, Dr. Andrew Churg, thinks it necessary to find asbestos in a patient's lungs before mesothelioma caused by asbestos can be diagnosed and holds other opinions that would further undermine the inference that the micronite filter caused Mr. Braun's mesothelioma. The lawyer read passages from Dr. Churg's scientific writings that seemed to support the line the lawyer took in the cross-examination, for example by indicating that asbestos fibers, including the carcinogenic variety such as crocidolite, are present in the lungs of most people, only a tiny fraction of whom develop mesothelioma. Andrew Churg, "Mineral Analysis of the Lung Parenchyma," in 2 *The Lung: Scientific Foundations* 1869, 1875 (Ronald G. Crystal et al. eds.1991).

■ On redirect examination the plaintiff's lawyer tried to ask Dr. Cugell whether Churg had opined that smoking Kents with the micronite filter could cause mesothelioma. The judge sustained the defendant's objection to the question when it turned out that Churg had expressed this opinion in testimony in another lawsuit. The judge thought it unscientific of Cugell to rely on testimony in forming his own opinion about the causality of mesothelioma. Maybe so. But the issue here is not *Daubert*. It is the proper scope of redirect examination. The cross-examination of Cugell had conveyed the impression that Dr. Churg believed, contrary to Cugell, that the Kent filter could not cause mesothelioma. In fact he believed the opposite, and it was proper to demonstrate this in the redirect examination of the witness whose testimony had been called into question by the misleading cross-examination. *United States v. Gant*, 17 F.3d 935, 942 (7th Cir.1994); *United States v. Martinez*, 988 F.2d 685, 702 (7th Cir.1993); *In re Air Disaster at Lockerbie*, 37 F.3d 804, 817 (2d Cir.1994).

■ But the error was harmless. Dr. Cugell was permitted on redirect examination to testify that he had based his opinion,

which was favorable to the plaintiff's theory of causation, in part on statements by the very Dr. Churg whom the defendants had tried to show supported their views. Cugell was not, it is true, permitted to identify the statement that Churg had made in the other lawsuit—that he believes that the Kent filter could cause mesothelioma. To permit Dr. Cugell to have repeated Churg's testimony might well have been overkill, without a collateral inquiry, which might have confused the jury and would certainly have protracted the trial, into the scientific basis of that testimony.

We find no basis for upsetting the jury's verdict, and the judgment for the defendants is therefore

AFFIRMED.