**James J. SHEEHAN, Plaintiff–Appellant,**

v.

**DAILY RACING FORM, INCORPO-RATED, Defendant–Appellee.**

No. 96–2123.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1996.

Decided Jan. 15, 1997.

Rehearing Denied Feb. 25, 1997.

H. Candace Gorman (argued), Gregory X. Gorman, Gorman & Gorman, Chicago, IL, for plaintiff–appellant.

Damon E. Dunn (argued), Levin & Funkhouser, Chicago, IL, for defendant–appellee.

Before POSNER, Chief Judge, and ESCHBACH and EVANS, Circuit Judges.

POSNER, Chief Judge.

■ A plaintiff can avert summary judgment for the defendant in an employment discrimination case either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the *McDonnell Douglas* formula. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff in this case tried both ways of staving off summary judgment, but failed in each.

James Sheehan was an assistant editor in the Chicago office of the *Daily Racing Form,* which made him the number three man after Shulman, the head of the office, and McEvoy, the editor of the Chicago edition. Sheehan's specialty was layout, and he was good at it. He also functioned as McEvoy's number two man. "Layout" means fitting together the articles in a newspaper or other publication so that each page looks neat and well designed. When done by hand, as Sheehan did it, layout requires a good deal of skill, which Sheehan is admitted to have. As part of the acquisition of the already-computerized publisher of another racing sheet, however, the defendant decided to convert to a computerized system of publishing. Layout would be done by computer ("electronic pagination") and editions for different cities would be made up in one place and distributed electronically for printing locally. As a result of the substitution of computers for human labor, the Chicago edition of the *Daily Racing Form* would cease to be published in Chicago, and this portended the eventual closing of the Chicago office as publishing became consolidated in fewer offices. Not only would fewer workers be required but their tasks would be different. Tasks such as layout formerly done by hand would now be computerized and this meant that employees such as Sheehan who had performed those tasks by hand would have to be trained to do them by computer. Their old skills might not be transferable, in just the same way that a skilled portrait painter might prove not to be a skilled photographer. Sheehan had no experience with computers, but along with other employees of the Chicago office he was given several weeks of training. In 1993, when the Chicago office was closed, Sheehan, aged 54, was among the employees of the office who were discharged rather than transferred to other offices of the company.

Sheehan relies on just two pieces of evidence to establish a prima facie case of discrimination by the conventional, or as it is more commonly but confusingly called the "direct," method. (The confusion lies in the fact that the direct method may employ circumstantial evidence along with or for that matter in place of "direct" evidence, *Troupe v. May Department Stores Co.,* 20 F.3d 734,

736 (7th Cir.1994), which in an employment discrimination case would normally require an admission.) Both pieces of evidence derive from the same document, a list that Shulman sent to company headquarters almost a year before the Chicago office closed. It is a list of the 17 employees of the office—including Sheehan—whom Shulman wanted the company to retain when the office was closed. Each entry gives the name, job title, date of birth, date of appointment to current job, union affiliation, likely willingness to relocate (on a scale of 1 to 10), and a brief evaluation. Sheehan's entry, which is typical, reads: "Jim Sheehan—Ass't Turf Editor, 3/28/39, 6/9/90, Independent, –8–. Good layout and design. Dedicated perfectionist." Actually the list has 18 rather than 17 entries, the eighteenth being Bob Sebring, about whom the memo states: "I have omitted Bob Sebring, Director of Operations, from the foregoing as his value to us is obvious." Of the 17 persons on the list (that is, excluding Sebring), 11 were 48 years old or older and of these only 2 were retained. Six were 42 or younger (there were none between 42 and 48) and all of those were asked to remain. Of the 18—that is, if Sebring is included—12 were 48 or older and 3 of those were retained. Sebring was in his fifties, as was Shulman himself—and since he was the boss of the office about to be closed his head too was potentially on the chopping block, so maybe the list was implicitly a list of 19, not 17. An affidavit by a statistician hired by the plaintiff as an expert witness states that the probability that the retentions in the list of 17 are uncorrelated with age is less than 5 percent. The plaintiff argues that the affidavit, in combination with the fact that the list contains the age (more precisely, the birth date, from which age can of course be readily computed) of each of the employees on the list, establishes a jury issue of age discrimination.

We cannot agree. The listing of birth dates cannot without more be thought evidence of age discrimination. E.g., *Timm v. Mead Corp.,* 32 F.3d 273, 276 (7th Cir.1994); *Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 848–49 (7th Cir.1992) (per curiam); *Armbruster v. Unisys Corp.,* 32 F.3d

768, 780–81 (3d Cir.1994); *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 514 (6th Cir.1991). Age, like sex, is a salient characteristic—information that we use to "place" someone we don't know, to help form a picture in our mind of the person. Newspapers when reporting on someone not well known to the public invariably report the person's name and indicate (if the first name doesn't make it obvious) the person's sex. Age or date of birth is required on drivers' licenses and countless other official and unofficial documents and applications. There is no implication of discriminatory motive in the use of age as an identifying characteristic. And remember that the entire list of 17 is of the people whom Shulman thought the company should retain. It is not as if he had been identifying the ones he thought should be retained, and the ones he thought should be discharged, by age and inviting his bosses to make their cuts accordingly.

■ Equally without evidentiary significance is the statistical analysis of the list of 17; indeed, the analysis was not even admissible under the standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), governing the admissibility of expert testimony, which requires the district judge to satisfy himself that the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. E.g., *Braun v. Lorillard Inc.,* 84 F.3d 230, 234–35 (7th Cir.1996); *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316–19 (9th Cir.1995); cf. *Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989). Although the expert used standard statistical methods for determining whether there was a significant correlation between age and retention for the 17 persons on the list, see Michael O. Finkelstein & Bruce Levin, *Statistics for Lawyers* 157 (1990) (Fisher's exact test), the omission of Sebring and Shulman from the sample tested was arbitrary. The expert should at least have indicated the sensitivity of his analysis to these omissions. More important is the expert's failure to correct for any potential explanatory variables other than age. Completely ignored

was the more than remote possibility that age was correlated with a legitimate job-related qualification, such as familiarity with computers. Everyone knows that younger people are on average more comfortable with computers than older people are, just as older people are on average more comfortable with manual-shift cars than younger people are. Three weeks of training might go some distance toward closing the computer-literacy gap, yet it would be more surprising than otherwise if so short a period of training could close the gap completely. The expert could easily have inquired about the feasibility of ascertaining through discovery the history of the use of computers by each of the employees on the list of 17.

What is more, he ignored the fact that the 17 employees held a variety of jobs. Some were unionized workers with no supervisory responsibilities. There were only 2 supervisors—McEvoy and Sheehan, and the former, who was even older than Sheehan, was nevertheless retained. Of the 19 who should have been on the list, 4 were supervisors (Shulman, Sebring, McEvoy, and Sheehan) and the 3 *oldest* were retained.

The expert's failure to make any adjustment for variables bearing on the decision whether to discharge or retain a person on the list other than age—his equating a simple statistical correlation to a causal relation ("of course, if age had no role in termination, we should expect that equal proportions of older and younger employees would be terminated"—true only if no other factor relevant to termination is correlated with age)—indicates a failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation. In litigation an expert may consider (he may have a financial incentive to consider) looser standards to apply. Since the expert's statistical study would not have been admissible at trial, it was entitled to zero weight in considering whether to grant or deny summary judgment.

■ That leaves the *McDonnell Douglas* approach to be considered. The approach was not designed for a situation in which job requirements change, although maybe it can

be adapted to it. The assumption behind the approach in a case of termination is that the plaintiff was doing fine in his job, lost it, and was replaced by someone younger, or white, or male, or not handicapped, etc. When the job disappears for reasons unrelated to discrimination—and there is no suggestion that the defendant decided to computerize its operations in order to get rid of its older workers, or for any other reason unrelated to bona fide business considerations—the *McDonnell Douglas* approach has itself to be reconfigured, if not indeed abandoned. Perhaps the way to preserve it here is to recast this case as a hiring case. Sheehan's job—assistant editor with primary responsibility for manual layout—disappeared. It was replaced by a job called "Associate Editor" (Sheehan's job title had been "Assistant Turf Editor") in the defendant's Lexington, Kentucky office, in which publication functions formerly performed in Chicago and elsewhere were consolidated. That job went to McEvoy. No surprise there: McEvoy had lost his job as editor of the Chicago edition, now defunct, and had done very well in his computer training and was therefore a natural for assignment to a similar position. Since McEvoy was not only better but older than Sheehan, Sheehan cannot satisfy the second step of *McDonnell Douglas*—the step of proving (in an age discrimination case) that the job for which he was competing went to a younger person. (And not just a day or two younger, either, but *substantially* younger. *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996).)

The 5 persons on the list of 17 who were younger than Sheehan and were retained (a sixth declined the new job he was offered) were given jobs different from the Associate Editor's job that was the counterpart of Sheehan's old job. The fact that younger workers on the list of 17 were retained in other jobs says no more about discrimination than if an automotive engineer fired by General Motors allegedly on grounds of age pointed out that GM had a 17-year-old in its mail room. One of the 5, it is true, received a job as Page Editor, and Sheehan claims that he was more qualified for it. His briefs in this court, however, do not discuss the requirements of the job, let alone show that he was more qualified to perform the duties of the job than the person who got it. According to the defendant's uncontradicted submission, the Page Editor was to be a kind of one-man publishing band, who would rewrite articles, enter them together with racing data in the computer, compose an edition, and dispatch it for printing. Sheehan presented no evidence that he was well suited for this demanding and specialized job. He argues that he *must* be, since as McEvoy's deputy in Chicago he supervised the workers who did the various components of the new Page Editor's job. But of course a supervisor is not automatically qualified to do all his subordinates' jobs. Most executives could not switch places with their secretaries.

AFFIRMED.